SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd #203
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Fax: (702) 643-6292
Chattahlaw@gmail.com
*Counsel for Plaintiffs*

JOSEPH S. GILBERT, ESQ.
Nevada Bar No.: 9033
JOEY GILBERT LAW
405 Marsh Ave.
Reno, Nevada 89509
Tel: (775) 284-7000
Fax: (775) 284-3809
Joey@joeygilbertlaw.com
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JANE DOE as Guardian of J. DOE, a minor, and in her individual capacity,<br><br>Plaintiffs,<br><br>vs.<br><br>WASHOE COUNTY SCHOOL DISTRICT, a political subdivision of the State of Nevada, its BOARD OF TRUSTEES, and its SUPERINTENDENT, DR. SUSAN ENFELD, DOES I-XX and ROE entities I-XX.<br><br>Defendants. | Case No: 3:23-cv-00129 ART-CLB<br><br>**MOTION FOR PRELIMINARY INJUNCTION** |

## MOTION FOR PRELIMINARY INJUNCTION

COME NOW, PLAINTIFFS, JANE DOE *Et Al*, by and through the undersigned attorney of record, SIGAL CHATTAH, ESQ., of the CHATTAH LAW GROUP, and JOEY S. GILBERT, ESQ of JOEY GILBERT LAW and pursuant to Fed. R. Civ. Pro. 65, hereby move this Court for a preliminary injunction against Defendants, to enjoin the Washoe County School District (hereinafter "WCSD") from engaging in and enforcing Administrative Regulation 5161 GENDER IDENTITY AND GENDER NON-CONFORMITY – STUDENTS.

The purpose of this Motion is made because Defendants continue to promote this Regulation, directly interfering with parental rights of custody and control of their children. This Regulation continues to violate the First, fourteenth and Ninth Amendments. Defendants have bypassed Plaintiffs' due process rights and Plaintiffs are entitled to relief thereon.

Plaintiffs' Motion is based upon the pleadings and papers on file herein, the Exhibits attached and Declarations filed concurrently herewith, and the following points and authorities.

## INTRODUCTION

Nearly a century of Supreme Court precedent makes two things clear: parents have a constitutional liberty interest in the care, custody, and control of their children, and students do not abandon their First Amendment rights at the schoolhouse gate.

WCSD is flouting both of these constitutional guarantees through its adoption of Administrative Regulation 5161 GENDER IDENTITY AND GENDER NON-CONFORMITY – STUDENTS (hereinafter "The Regulation" and "5161" *inter alia*)

This Regulation authorizes schools and children to make fundamentally important decisions concerning their gender identity without any parental involvement and to then hide these decisions from their parents. Per the Policy, Transgender and gender non-conforming

students have a right to privacy, including keeping private their sexual orientation, gender identity, transgender status, or gender non-conforming presentation at school.

Transgender and gender non-conforming students have the right to discuss and express their gender identity and expression openly and to decide when, with whom, and how much to share their private information.

WCSD has also instituted a program called "Brave Space" Training for the purposes of training educators and school administrators how to address these gender identity and gender non-conformity matters by bypassing parental notification and referral to third party (off school-site) organizations to seek help with non-conformity issues.

WCSD allows teachers and administrators to attend three-day training sessions to learn how to institute Brave space policies, obstructing parental rights. Plaintiffs bring this Motion to enjoin WCSD from enforcement of Reg 5161 in its entirety as it applies to gender identity studies and policies.

## STATEMENT OF FACTS

Following a series of events in school with minor J. Doe at Depaoli Middle School, Plaintiff obtained information regarding WCSD Gender Identity/Non-conformity studies and Brave Space training from Depaoli faculty.

Plaintiff Doe was advised that Depaoli teachers call students by their preferred pronouns and that there was a gender policy that assured the students secrecy from their parents. Plaintiff investigated the Brave Space training programs and obtained the material

provided in the 3-day Brave Space training program which took place via zoom on April, 17th, 19th, and 20th, 2023.[1]

This program was hosted by WCSD included LGBTQ Education. It became clear through the materials presented that the training "Brave Space" teachers were provided was in direct contradiction with parental rights. Plaintiff was appalled to see that the Brave Space Training actually includes training teachers to hide students' "identities" from their own parents *See Exhibit 1; P021, P026.* [2]

Day 3 of the Brave Space training focused on WCSD Reg 5161[3] provides the following:

- "[S]taff **shall not disclose information** that may reveal a student's transgender or gender non-conforming status to others, **including parents/guardians** or other staff members, unless there is a specific 'need to know,' they are legally required to do so, or the student has authorized such disclosure." [*Emphasis added*]
- "[S]taff must be mindful of the confidentiality and privacy rights of students when **contacting parents/guardians so as to not reveal, imply or refer to a student's** actual or perceived sexual orientation, gender identity, or gender expression." [*Emphasis added*]
- "[S]tudents have the right to be addressed by the names and pronouns that correspond **to their gender identity**." [*Emphasis added*]

---

[1] See *Exhibit "1"* Brave Space slides P001-031.
[2] See Plaintiffs' Declaration incorporated by reference hereto as to the nature of Brave Space Training.
[3] See Reg 5161 in its entirety, attached hereto and incorporated herewith as *Exhibit "2"*

These actions under the Regulation can happen without **any knowledge or input** from the child's parents. Instead, these decisions will be made solely by the child and "school administrators and/or school counselors." The District will withhold this information even if it is specifically requested by parents. Under the Regulation, the District will not tell parents whether their child is accommodated under the regulation, whether the child has made requests concerning their gender identity, or any other information that would reveal the child's "transgender status."

Parents are completely and purposely left in the dark as the Regulation plainly violates parents' rights under the Fourteenth Amendment. WCSD has displayed a similar disregard for students' First Amendment rights. The Policy punishes students for expressing their sincerely held beliefs about biological sex and compels them to affirm the beliefs of administrators and their fellow students. Any individual's failure to adhere to Reg 5161, submits them to punitive action under Washoe County School Board Policy 9200[4] entitled "Harassment and Discrimination Prohibited".

This speech code blatantly violates the First and Fourteenth Amendments. Plaintiffs seek this Court enjoin WCSD from engaging in the Brave Space program and the usage of Reg 5161 in violation of Parents' constitutional rights as delineated herein.

## LEGAL AUTHORITY

### A. STANDARD FOR INJUNCTION

A motion for a preliminary injunction is governed by the multi-factor test outlined by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20*

---

[4] See Reg 9200 attached hereto as *Exhibit "3"*

*(2008).* Under the *Winter* test, the plaintiff has the burden to establish: (1) likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) that the balance of equities favors the plaintiff; and (4) that the injunction is in the public interest. *Id*. Likelihood of success on the merits is a threshold inquiry and the most important factor. *See, e.g., Edge v. City of Everett, 929 F.3d 657, 663 (9th Cir. 2019).*

Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor. *NRDC v. Winter, 518 F.3d at 677 (internal citations omitted).*[i] In our circuit, there is no presumption that the issuance of a preliminary injunction requires an evidentiary hearing. *See Int'l Molders' & Allied Workers' Local Union v. Nelson, 799 F.2d 547, 555 (9th Cir. 1986).*

***1. Likelihood of Success on the Merits***

Plaintiffs are likely to prevail on the merits, or at least have raised a serious question to the merits of their procedural and substantive due process claims against Defendants. To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of a federal right by a person acting under color of state law. The Ninth Circuit has repeatedly stated that "[t]o obtain relief on a procedural due process claim, the plaintiff must establish the existence of (1) a liberty or property interest protected by the constitution; (2) a deprivation of the interest by the government; 3) lack of process." *See Shanks v Dessel, 540 F.3d 1082, 1090 (9th Cir. 2008).*

Here, Plaintiffs are forced to capitulate to a policy that not only violates their freedom of speech and religious freedoms, but also deliberately interferes with parental rights and the

family unit. Notwithstanding same, it subjects to students to discipline for a refusal to acquiesce to such conduct.

**B. DEFENDANTS EXCLUDE PARENTS FROM DECISIONS REGARDING GENDER IDENTITY IN VIOLATION OF THE FOURTEENTH AMENDMENT**

"[T]he interest of parents in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). Children are "not the mere creature of the state," *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), and the "right[] … to raise one's children ha[s] been deemed 'essential'" and one of the "'basic civil rights of man,'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). These parental rights are rooted in the "historical[] … recogni[tion] that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (citing 1 W. Blackstone, Commentaries, 447; 2 J. Kent, Commentaries on American Law, 190).

Thus, "'[i]t is cardinal'" that "'the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" *Troxel*, 530 U.S. at 65-66 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

A child's gender identity implicates the most fundamental issues concerning the child, including the child's religion, medical care, mental health, sense of self, and more. Yet despite "extensive precedent" that parents must be involved in decisions concerning these types of

issues, *Troxel*, 530 U.S. at 66 (listing cases), school districts across the country are increasingly excluding parents from decision making when gender identity is involved. "In the past few years, school districts nationwide have quietly adopted policies requiring staff to facilitate and 'affirm' gender identity transitions at school without parental notice or consent—and even in secret from parents." Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights*, 1, American Enterprise Institute, (Mar. 2022), https://bit.ly/39s1GQF.

Under parental exclusion policies, "[e]ducators and staff," not parents, "work closely with the student to determine what changes are necessary . . . to ensure their safety and well-being." GLSEN & National Center for Transgender Equality, *Model Local Education Policy on Transgender and Non-Binary Students*, 7-8 (Sept. 2018), https://bit.ly/3PHTyv9.

Parental exclusion policies "run directly against a strong body of case law recognizing parents' constitutional rights to raise their children." Berg, *supra*, at 2. Nevertheless, they have proliferated to school districts across the country, including Washoe County.

The Due Process Clause in the 14th Amendment to the United States Constitution protects the fundamental right of parents to direct the education, upbringing and the care, custody, and control of their children. *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57, 68 (2000).

Defendants have violated and are violating Plaintiffs' fundamental right to make decisions regarding the upbringing, education, custody, care, and control of their children in establishing and implementing Regulation 5161 that prohibits informing parents regarding their children's assertions regarding gender non-conformity, transgender status and attendant requests to affirm alternate identities unless their minor children of any age consent.

Defendants have acted and are acting with reckless disregard for Plaintiffs' fundamental parental rights by purposefully and intentionally concealing critical information regarding the upbringing and care of their children, *i.e.*, that the children are asserting a discordant gender identity, that the children have requested to be addressed by an opposite sex name and pronouns and other information associated with affirming the child's assertions.

Defendants have acted and are acting with reckless disregard for Plaintiffs' fundamental parental rights by continuing to implement this protocol, *i.e.*, a *de facto* school district policy of undermining parental authority based on an unsubstantiated assertion that state law and WCSD Regulation provides that children of any age have the authority to determine whether their parents will be informed when they raise issues of gender non-conformity or transgender status, request to be called by an alternative name or pronouns and even use privacy facilities designated for the opposite sex.

In so doing, Defendants are explicitly and intentionally excluding Plaintiffs from significant decision-making directly related to their children's care.

Under binding precedent, the Fourteenth Amendment "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel*, 530 U.S. at 65 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Among these unenumerated rights are those that are "'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2257-58 (2022) (quoting *Glucksburg*, 521 U.S. at 721).

The "liberty interest . . . of parents in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65. Nearly 100 years ago, the Supreme Court held that the "liberty"

protected by the Fourteenth Amendment includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Two years later, the Court held that the "liberty of parents and guardian" includes the right "to direct the upbringing and education of children under their control." *Pierce*, 268 U.S. at 534- 35 (1925). As the Court explained, "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id*. at 535.

Parents are **<u>entitled</u>** to ask on a regular basis whether their children have requested or have engaged in "Brave Space" advice, whether their children have made requests or actions have been taken concerning their children's gender identity, and whether the WCSD has any other information that would reveal their children's "transgender status." Yet under Regulation 5161, WCSD *will not tell them* any of this information. It is impossible for parents to direct the "care, custody, and control of their children" when WCSD withholds critical information from them.

Regulation 5161 also deprives parents of the right to have any input or control over fundamental decisions concerning gender identity. Under the Regulation, the parent has no control over how WCSD treats their child.

Without *any* parental input, the District can (1) require all employees and students to address the child by a new name; (2) require all employees and students to address the child through a new pronoun; (3) have the child's name changed on numerous government documents, including identification cards, yearbooks, and diplomas; (4) allow the child to use the restrooms, locker rooms, and changing facilities that correspond with the child's gender identity; (5) allow the child to participate in physical education classes, intramural sports,

clubs, and other events that correspond with the child's gender identity; and (6) allow the child to room with other students who share the child's gender identity. These are *fundamental decisions* implementing the most basic questions about a child's life, including issues of religion, medical care, mental and emotional well-being, the child's sense of self, and more.

A recent decision from the District of Kansas is directly on point. There, a local school board policy prohibited teachers from "revealing to a student's parents a preferred name or pronouns the student is using at school if the student has not authorized the parents to know." *Ricard v. USD 475 Geary County, KS*, 2022 WL 1471372, at *4-5 (D. Kan. May 9, 2022). Discussing the "constitutional right [of parents] to control the upbringing of their children," the court found it inconceivable that a school district could constitutionally "withhold[] or conceal[] from the parents of minor children information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns." *Id*. at *8. Whether "the District likes it or not," the constitutional right of parents "includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred." *Id*.

WCSD may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name, to use different pronouns, or to implement other decisions involving gender identity. But this "merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit." *Id.*

The government must afford a "presumption of validity" to parental decisions unless there is clear evidence to the contrary. *Troxel, 530 U.S. at 67*. As "long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject

itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id. at 68-69; see Ricard, 2022 WL 1471372, at *8* (envisioning a "particularized and substantiated concern that disclosure to a parent could lead to child abuse, neglect, or other *illegal* conduct"). But "[s]imply because the decision of a parent is not agreeable to a child … does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham, 442 U.S. at 60.*

Here, the District "not only fail[s] to presume" that parents will "act in the best interest of their children, [it] assume[s] the exact opposite." *Doe v. Heck, 327 F.3d 492, 521 (7th Cir. 2003).* The District has *no right* to deprive parents of this critical information and control concerning their child. The Policy plainly violates the Fourteenth Amendment.

Affirming a child's discordant gender identity involves significant mental health and medical decisions affecting the well-being of children with potentially life-long consequences. Therefore, by excluding parents from discussions regarding their children's assertion of a discordant gender identity and adopting the Protocol aimed at secretively affirming the discordant gender identity, Defendants are making, and have made decisions that affect the mental health of Plaintiffs' children in contravention of Plaintiffs' fundamental rights as enumerated in the U.S. Constitution and Nevada law.

### C. DEFENDANTS' REGULATION 5161 VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS OF FREE SPEECH

Public-school students have First Amendment rights, and those rights do not disappear "at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Because "America's public schools are the nurseries of democracy," students must be free to express their opinions, even if their views are "unpopular." *Mahanoy Area Sch. Dist. v.*

*B.L. by and through Levy*, 141 S. Ct. 2038, 2046 (2021). Protecting unpopular speech in public schools "ensur[es] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.*

Despite these well-established rights, schools often seek to stamp out controversial student expression. Speech codes are the tried-and-true method of suppressing unpopular student speech. They prohibit expression that would otherwise be constitutionally protected. *See* Foundation for Individual Rights in Education, *Spotlight on Speech Codes 2021*, 10, *https://bit.ly/3pdQ09E*.

Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." *Id.* Because these policies impose vague, overbroad, content-based (and sometimes viewpoint-based) restrictions on speech, federal courts regularly strike them down. *Id.* at 10, 24; *Speech First v. Fenves*, 979 F.3d 319, 338-39 n.17 (5th Cir. 2020) (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

Schools are increasingly adopting speech codes regarding gender identity to compel students to affirm beliefs they do not hold and that are incompatible with their deeply held convictions. So-called "preferred pronouns policies" are an increasingly used method of compelling student speech. "Preferred pronoun policies" subject students to formal discipline for referring to other students according to the pronouns that are consistent with their biological sex rather than their gender identity. Under these types of policies, a student who uses "he" or "him" when referring to a biological male who identifies as a female will be punished for "misgendering" that student. *See, e.g.*, Rick Esenberg & Luke Berg, *The Progressive Pronoun Police Come for Middle Schoolers*, The Wall Street Journal, (May 23, 2022), *https://on.wsj.com/3NTV50b.*

The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). "[T]he latter is perhaps the more sacred of the two rights." *Telescope Media Grp. V. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019).

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*." *West Virginia Bd. Of Ed. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 138 S. Ct. at 2463.

The Policy is no different from the policy requiring schoolchildren to pledge alliance to the flag in *Barnette*. Like the West Virginia State Board of Education in *Barnette*, *cf.* 319 U.S. at 631, 633, Washoe County School District is requiring students to affirmatively declare statements that they believe to be false and affirm ideologies with which they deeply disagree or otherwise face discipline under Administrative Regulation 9200.

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), is directly on point. There, the Sixth Circuit held that a similar "preferred pronoun" requirement was "anathema to the principles underlying the First Amendment." *Id.* at 510. "Indeed, the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Id.* (quoting *Boy Scouts of Am. v. Dale*, was a content-based regulation subject to strict scrutiny).

In addition, "the First Amendment's hostility to content-based regulation extends" to "restrictions on particular viewpoints." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Viewpoint discrimination is flatly prohibited. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019); *Mahanoy*, 141 S. Ct. at 2046 (schools cannot "suppress speech simply because it is unpopular").

Here, WCSD has adopted a policy that disciplines students for the content and viewpoint of their speech. Specifically, Reg 5161 prohibits an intentional and/or persistent refusal to respect a student's gender identity. Reg 5161 also prohibits "misgendering," which it defines as instances when hen a person accidentally or intentionally uses the incorrect name or pronouns to refer to a person. This is a classic content-based and viewpoint-based regulation of speech. *See, e.g., Saxe v. State College Area School District*, 240 F.3d 200, 206 (3d Cir. 2001) (bans on "'harassment'" covering speech impose "'content-based'" and often "'viewpoint-discriminatory'" restrictions on that speech).

WCSD has no compelling interest in suppressing this type of student speech, and, even if it did, the District's restrictions are not narrowly tailored to further that interest. *See Mahanoy*, 141 S. Ct. at 2046; *see also Willson v. City of Bel-Nor, Missouri*, 924 F.3d 995, 1001 (8th Cir. 2019).

**D. DEFENDANTS MUST DEMONSTRATE THAT REGULATION 5161 WAS ISSUED TO FURTHER A COMPELLING GOVERNMENT INTEREST AND MUST BE NARROWLY TAILORED TO ACHIEVE THAT INTEREST**

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Supreme Court has interpreted this guarantee "to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a

compelling state interest." *Reno v. Flores, 507 U.S. 292, 301–02 (1993).* To survive strict scrutiny, the government must show that "the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).*

The Supreme Court has long held that "the right of parents to make decisions concerning the care, custody, and control of their children is a fundamental liberty interest protected by the Due Process Clause," and that this right includes "the right of parents to be free from state interference with their choice of the educational forum itself." *Fields v. Palmdale School District, 427 F.3d 1197, 1204,1207 (9th Cir. 2005)*

Thus, even as the Court has "'always been reluctant to expand the concept of substantive due process,'" it has repeatedly reaffirmed its recognition, in *Meyer v. Nebraska, 262 U.S. 390 (1923)* and *Pierce v. Society of Sisters, 268 U.S. 510 (1925).*, of a "fundamental right[]" to "direct the education and upbringing of one's children." *Glucksberg, 521 U.S. at 720 (citation omitted); see also Troxel, 530 U.S. at 65 (plurality)* (describing the *Meyer*-right as "perhaps the oldest of the fundamental liberty interests recognized" by the Court); *Id. at 80.* In *Meyer*, the Supreme Court struck down the Nebraska statute, concluding that it impermissibly "attempted materially to interfere . . . with the power of parents to control the education of their own." *Id. at 401.*

To satisfy strict scrutiny, Defendants must show that their infringement of the Plaintiffs' rights is "narrowly tailored" to advance a "compelling" state interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993).* "

**E. REGULATION 5161 IS OVERBROAD AND VAGUE AND IS THEREFORE PROHIBITED**

The First Amendment also prohibits the government from adopting regulations of

students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). Schools must carefully craft their regulations "to punish only speech and not be susceptible of application to protected expression." *Id*.

Reg 5161 and 9200 are unconstitutionally overbroad. By its terms, the Regulations apply to protected speech and virtually any opinion or political belief—as well as any use of humor, satire, or parody— could be perceived as "a refusal … to respect a student's gender identity." Regs 5161 and 9200 also do not differentiate between "on campus" and "off campus" speech, even though the District's ability to punish off-campus speech is extremely limited. *See Mahanoy*, 141 S. Ct. at 2046. Courts regularly find these types of far-reaching school policies to be unconstitutionally overbroad. *See, e.g., Saxe*, 240 F.3d at 215-16 (high school speech policy punishing "harassment" was overbroad because it "prohibit[ed] a substantial amount of non-vulgar, non-sponsored student speech"); *Flaherty v. Keystone Oaks School Dist.*, 247 F. Supp. 2d 698, 701-02 (W.D. Penn. 2003) (speech policy prohibiting "abusive," "inappropriate," and "offen[sive]" language was overbroad).

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007); *see also Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1311 (8th Cir. 1997) ("a central purpose of the vagueness doctrine" is to prevent "arbitrary and discriminatory enforcement").

"With respect to the first goal, … '[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Ass'n of Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id*. (quoting *Grayned*, 408 U.S. at 108-09).

This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

Regulations 5161 and 9200, among other things, lacks any definitions, detail, context, or notice to students about what sorts of statements WCSD views as "harassment" and "discrimination." This provision guarantees arbitrary enforcement and is therefore unconstitutional.

**F. REGULATION 5161 VIOLATES THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT**

The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' right to free exercise of religion.

Plaintiffs have sincerely held religious beliefs that human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity, and biological reality, as either male or female.

Plaintiffs have sincerely held religious beliefs that parents have the non-delegable duty to direct the upbringing and beliefs, religious training, and medical and mental health care of their children and any intrusion of the government into that realm infringes upon the free exercise of their religion.

Defendants' actions in excluding Plaintiffs from decision making regarding their children's sexual and gender identity target the Plaintiffs' beliefs regarding the created order, human nature, sexuality, gender, ethics, and morality which constitute central components of their sincerely held religious beliefs. Defendants' actions further cause a direct and immediate conflict with Plaintiffs' religious beliefs by prohibiting them from being informed of mental health issues their children are or might be undergoing and denying them the opportunity to seek counseling and guidance for their children in a manner that is consistent with the beliefs sincerely held by their family instead of the government.

Defendants' actions are coercive in that they deliberately supplant Plaintiffs' role as advisors of the moral and religious development of their children so that they are not able to direct their children's mental health care and counseling regarding sex and gender identity in accordance with their values because Defendants have substituted the state's perspective on the issues of sex and gender identity for the perspective of Plaintiffs in violation of Plaintiffs' free exercise rights.

Defendants' actions are neither neutral nor generally applicable, but rather, specifically and discriminatorily target the religious speech, beliefs, and viewpoint of Plaintiffs and thus expressly constitute a substantial burden on sincerely held religious beliefs that are contrary to

Defendants' viewpoint regarding gender identity and affirmation of a discordant gender identity.

The Free Exercise Clause of the First Amendment provides: "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*." U.S. Const. amend. I (emphasis added). Under the federal Free Exercise Clause, a law that "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons" is subject to strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).

To survive that "stringent standard," the government must prove that the law is narrowly tailored to further a compelling government interest. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 (2017). As discussed *supra*, the regulation 5161 cannot survive strict scrutiny. Under current constitutional jurisprudence, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.'" *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990). Thus, a law that is "neutral" and "generally applicable" is not subject to strict scrutiny even if it has the incidental effect of burdening a religious belief or practice. *See id.* But this "rule comes with an exception." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012).

When the policy "appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions," it "must run the gauntlet of strict scrutiny." *Id*. at 740.

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532 (emphasis added); *see also Trinity Lutheran*, 137 S. Ct. at 2021 ("Nor may a law regulate or outlaw conduct because it is religiously motivated.") (emphasis added).

If a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, **beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudg**e, and thereby give effect to the Constitution." [*Emphasis added*] *Id., 197 U.S. 11, 31 (1905) citing to Mugler v. Kansas, 123 U. S. 623, 123 U. S. 661; Minnesota v. Barber, 136 U. S. 313, 136 U. S. 320; Atkin v. Kansas, 191 U. S. 207, 191 U. S. 223.*

**G. THIS COURT CAN ENJOIN THE REGULATIONS IMMEDIATELY**

Importantly and most recently, *Whole Woman's Health Et Al v. Austin Reeve Jackson, Judge Et Al* 594 U. S. ____ (2021) demonstrates that this Court does have the authority to enjoin the regulations under the jurisprudence cited above, including *Roe v Wade*, *Griswold v Connecticut* and *Troxel v Granville.*

As the dissent cited in *Whole Woman's Health Et Al* this Court is authorized to permit those whom a law threatens with constitutional harm to bring pre-enforcement challenges to the law where the harm is less serious and the threat of enforcement less certain than the harm (and the threat) here. *See Virginia v. American Booksellers Assn., Inc., 484 U. S. 383, 392–393 (1988); Babbitt v. Farm Workers, 442 U. S. 289, 298 (1979); see also Susan B. Anthony List v. Driehaus, 573 U. S. 149, 164 (2014)* (finding substantial threat of future enforcement where statute permits "'any person'" to file a complaint and "the universe of potential complainants is not restricted").

Normally, where a legal right is "'invaded,'" the law provides "'a legal remedy by suit or action at law.'" *Marbury v. Madison, 1 Cranch 137, 163 (1803) (quoting 3 W. Blackstone Commentaries *23).* Here, these Plaintiffs bring action to this Court before violation of Regulation 5161 and 9200, or any other children similarly situated.

## H. PLAINTIFFS ARE LIKELY TO SUFFER IRREPERABLE HARM

To obtain a TRO, Plaintiffs must show they will suffer irreparable harm in the absence of the order. *Winter, 555 U.S. at 20.* The right of parental control is particularly strong in circumstances involving "fundamental values" and "intimate decision[s]." *Arnold v. Bd. of Educ. of Escambia Cnty. Ala.*, 880 F.2d 305, 313 (11th Cir. 1989) (parents' rights protect "the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children"); *see also H. L. v. Matheson*, 450 U.S. 398, 410 (1981) (parents' rights "presumptively include[ ] counseling [their children] on important decisions"). In such circumstances, parents are presumed to be fit to make decisions for their children absent strong evidence to the contrary. *See Parham*, 442 U.S. at 602- 03.

The Supreme Court has paid special attention to the rights of parents "in cases involving parent-state conflicts in the areas of medical care and education." *Arnold*, 880 F.2d at 312-13. Indeed, "[i]t is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000). "Public schools must not forget that '*in loco parentis*' does not mean displace parents." *Id.*

A refusal to enjoin the application of Regulation 5161 will undoubtably cause irreparable harm by allowing the District to displace Plaintiffs' values and preclude parents from making decisions for their children.

## I. BALANCE OF EQUITIES FAVORS PLAINTIFFS

### 1. *Defendants Have Not Demonstrated Regulation 5161 and 9200 are Narrowly Tailored to a Compelling State Interest*

Evaluating whether a government measure is narrowly tailored is not simply a matter of ordinary fact-finding, however. Narrow tailoring is viewed as a mixed question of fact and

law that requires a delicate balancing of legal principles as applied to specific circumstances. *See Gilbrook v. City of Westminster, 177 F.3d 839, 861 (9th Cir. 1999); Gerritsen v. City of Los Angeles, 994 F.2d 570, 575 (9th Cir. 1993).*

Plaintiffs must also show that the balance of equities tips in their favor. *Winter, 555 U.S. at 20.* The data provided above is a canvas of all States and positivity cases across the Country which clearly demonstrates that the efficacy of facemasks in the classrooms is at best questionable to prevent the spread of Covid-19. Notwithstanding the efficacy of such mask mandate, Defendants still fail to fulfill the requirements of due process and demonstrate that the States' action should stand in place of parental decisions regarding their children's health.

**J. AN INJUNCTION IS IN THE PUBLIC INTEREST**

Lastly, to obtain a TRO, Plaintiffs must show that the granting of a TRO is in the public interest., *555 U.S. at 20.* The public interest is furthered by preventing the violation of a party's constitutional rights. *Free the Nipple v, City of Ft. Collins, Colo, 916 F.3d 792 (2019).* "[I]t is always in the public interest to prevent the violation of a party's constitutional rights*.*" *Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd'* sub nom. *Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014) (quotations omitted).*

Because the requested injunction will accomplish this, the public interest also favors an order protecting Plaintiffs making the grant of an injunction in this case a matter of overwhelming public interest.

**CONCLUSION**

Again and again, the Supreme Court has affirmed the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66 (listing cases). Simply put, "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Yoder*,

406 U.S. at 232. “This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.” *Id*.

Reg 5161 violates parents’ constitutional rights and deprives parents of their right to know what actions WCSD is taking with regards to fundamentally important decisions about their children.

Accordingly, Plaintiffs request an injunction be issued as follows:

1. Permanently enjoin Defendants and all persons and entities in active concert or participation with Defendants from engaging in Regulation 5161 in Washoe County School District.

2. Issue an Order permanently repealing Regulation 5161 associated with parental rights and gender identity/non-conformity policies in Washoe County School District, and concurrently, repeal said portions of discipline associated therewith in Regulation 9200.

DATED this _11th_ day of May, 2023.

**JOEY GILBERT LAW**

*/s/ Joey S. Gilbert*
JOEY GILBERT LAW
405 Marsh Ave.
Reno, Nevada 89509
Tel: (775) 284-7000
Fax: (775) 284-3809
Joey@joeygilbertlaw.com
*Attorney for Plaintiffs*

**CHATTAH LAW GROUP**

*/s/ Sigal Chattah*
SIGAL CHATTAH, ESQ.
CHATTAH LAW GROUP
5875 S. Rainbow Blvd. #205
Las Vegas, Nevada 89118
Tel.:(702) 360-6200
Chattahlaw@gmail.com
*Attorney for Plaintiffs*